**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| LILLIAN BARTEE, *et al.*, *individually and on behalf of all others similarly situated*, ) ) ) | |
| Plaintiffs, ) ) | |
| vs. ) ) | Case No. 4:22-cv-00342-MTS |
| PROGRESSIVE ADVANCED INSURANCE COMPANY, *et al.*, ) ) ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is one of many filed by plaintiff-insureds across the country to challenge a specific price-negotiation adjustment that their insurers applied when making insurance claim settlement payments. As in those cases, Plaintiff Lillian Bartee and Plaintiff Lisa Bledsoe assert that their claims are appropriate for class treatment and have filed a Motion for Class Certification. Doc. [60]. Defendant Progressive Advanced Insurance Company ("Progressive Advanced") and Defendant Progressive Casualty Insurance Company ("Progressive Casualty") oppose the Motion, and they also move to exclude the testimony of several of Plaintiffs' retained experts, specifically: Kirk Felix, Jeffrey Martin, and Jason Merritt. Docs. [85], [86], and [87]. For the reasons that follow, the Court will deny each Motion at this time.

**I.   Background**

Plaintiff Bartee was involved in an automobile accident in late spring of 2018. She was insured under a policy issued by Progressive Advanced, and she made a claim for property damage pursuant to that policy. Likewise, Plaintiff Bledsoe crashed her vehicle in September of 2021, she was a party to an insurance policy issued by Progressive Casualty, and she submitted a

corresponding claim.  Defendants determined that both of Plaintiffs' vehicles were a total loss following their accidents.  To settle Plaintiffs' respective claims, Defendants used valuation reports prepared by their third-party vendor, Mitchell International, Inc. ("Mitchell"), to calculate the actual cash value ("ACV") of Plaintiffs' vehicles.  Accordingly, Progressive Advantage paid Plaintiff Bartee $8,196.13 to resolve the matter, Doc. [39-2] at 1; Doc. [76-20] at 2, and Progressive Casualty likewise paid Plaintiff Bledsoe $2,976.86, Doc. [39-3].  Plaintiffs assert that Defendants impermissibly decreased these amounts when Defendants applied Projected Sold Adjustments ("PSAs") during the calculation process.

To arrive at valuations like these, Mitchell uses its WorkCenter Total-Loss ("WCTL") database to generate a report for each loss vehicle.  Each report aggregates data from comparable vehicles within a certain geographical region.  Some of those comparator vehicles have sold for a certain price, and other comparators are merely listed for sale at a certain price.  If a comparable vehicle has already sold, Mitchell uses the vehicle's sold price as the starting point for its calculations.  Michell applies adjustments to the sold price based on "verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and condition." Doc. [61] at 9.  The adjusted values of each comparable vehicle are averaged to establish a "base value" for the insured-claimant's loss vehicle.  *See, e.g.*, Doc. [39-2] at 3.  For comparable vehicles that have not yet sold, however, Mitchell applies one additional threshold adjustment.  Rather than use the unsold vehicles' advertised or "list" price as the starting point for its calculations, Mitchell applies the PSA to "reflect customer purchasing behavior" as those customers negotiate "a different price than the list price."  Doc. [39-2] at 10.[1]  Evidence in the record suggests that the PSA is always a negative adjustment.  Doc. [62-4] at 63.  For example, as described in the Mitchell

---

[1] PSAs are not applied to unsold comparator vehicles that are listed for sale by single-price or no-haggle dealers.  *See* Doc. [62-4] at 97.

- 2 -

Report prepared for Plaintiff Bartee, the PSA reduced the list price of six comparable, unsold vehicles by approximately $802 on average. Doc. [39-2] at 6–9 (showing list-price reductions of $878, $744, $811, $793, $856, and $731). For both types of comparator vehicles, Mitchell applies further market adjustments related to the condition and other aspects of insured-claimant's loss vehicle to arrive at "the [loss] vehicle's adjusted market value." Doc. [61] at 13. "Finally, any taxes, fees, and deductible are automatically calculated and applied, which becomes the ultimate claim payment amount." *Id.*; see also Doc. [61-5] at 148–49.

From Plaintiffs' perspective, much of the methodology Mitchell uses to calculate ACV is unobjectionable. Doc. [61] at 11. But Plaintiffs *do* object to the PSA and argue that, by applying it, Defendants systematically breach the contractual obligations set forth in their insurance policies. Those policies uniformly provide that, when an insured suffers a covered loss, Defendants will pay, as applicable, "the [ACV] of the stolen or damaged property at the time of the loss reduced by the applicable deductible." Doc. [61-3] at 29. Further, ACV "is determined by the market value, age, and condition of the vehicle at the time the loss occurs." Doc [61-3] at 30. According to Plaintiffs, whenever Defendants purport to pay ACV of a loss vehicle after applying a PSA during the evaluation process, Defendants do not pay ACV "as determined by the market value" as the policy requires; instead, Defendants calculate an artificially lower value and pay a lower ACV as a result. Doc. [61] at 23.

Plaintiffs raise two key issues with respect to the PSA. First, Plaintiffs contend that the PSA is based on a false premise and does not resemble market realities applicable to buying and selling used cars. According to Plaintiffs, Defendants apply the PSA based on an incorrect assumption that car dealers list their used-car inventory at inflated prices, which they ultimately expect to lower when their customers seek to negotiate a lower price. Doc. [61] at 13. Plaintiffs'

industry expert, Kirk Felix, opines that price negotiation or haggling at car dealerships may have been commonplace years ago, but the advent of internet advertising as well as real-time pricing and car comparison tools have caused dealers to price their cars to market. *See* Doc. [61-8] at 4–5. Plaintiffs argue that the PSA is therefore spurious because car dealers no longer mark up their car prices and, for that reason, are unwilling to accept a lower price that a customer might offer. *Id.* at 4. Defendants counter that vehicles regularly sell for less than their list price, Doc. [76] at 9–10, and therefore the PSA *does* reflect consumer purchasing behavior.

Second, Plaintiffs argue that Defendants and their vendors have impermissibly manipulated the data underlying the PSA such that the negative adjustment is artificially inflated. Doc. [61] at 15; Doc. [62-5] at 5. They assert that, until July 2021, every transaction in which a used vehicle sold at or above its advertised price was excluded from the data used to calculate the PSA. Doc. [62-5] at 4. And to date, any transaction in which a used car sold for more than the list price is still excluded. *Id.* at 4–5. The result, Plaintiffs contend, is an inflated PSA that results in a greater reduction in list price than would otherwise occur if the excluded transaction data were used. *See id.* at 5. Defendants reply that, as their retained experts demonstrate, the PSA accurately estimates the difference between a used vehicle's list price and the price for which it ultimately sells. Doc. [76] at 12; Doc. [80] at 12. Accordingly, from Defendants' perspective, any data that is excluded from the calculation helps ensure that an accurate PSA is applied.

To summarize, Plaintiffs assert that the PSA is a categorically impermissible deduction that breaches the terms of their insurance policies.[2] Doc. [61] at 23 ("The central question is

---

[2] The Court observes that Plaintiffs do not expressly invoke their current theory of Defendants' breach or refer to the specific policy language that supports their theory in the operative complaint. *See* Doc. [39] at 16 (alleging that Progressive Advanced breached Plaintiff Bartee's policy because it paid her claim "for less than the ACV required by the insurance contract"). But this is of no moment because once a complaint specifies "the wrong done[,] . . . a plaintiff may substitute one legal theory for another without altering the complaint." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 764 (7th Cir. 2008) (quoting *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997)); *see Fitzgerald v.*

- 4 -

whether application of the PSA means . . . [that] Progressive is not calculating 'market value' as contractually required.").[3]  Plaintiffs further argue that, if Defendants had not applied the PSA to comparable vehicles in their Mitchell Reports, Defendants would have paid Plaintiffs a higher amount to settle their claims, and Plaintiffs contend that Defendants have likewise injured other similarly situated policyholders.  Plaintiffs now move to certify the following classes pursuant to Federal Rule of Civil Procedure 23(b)(3):

> **Progressive Advanced Class:** All persons who made a first-party claim on a policy of insurance issued by Progressive Advanced Insurance Company to a Missouri resident where, from March 24, 2012, through the date an order granting class certification is entered, Progressive Advanced Insurance Company determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.
>
> **Progressive Casualty Class:** All persons who made a first-party claim on a policy of insurance issued by Progressive Casualty Insurance Company to a Missouri resident where, from October 27, 2012, through the date an order granting class certification is entered, Progressive Casualty Insurance Company determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

Doc. [61] at 8.

Defendants oppose the motion, arguing that the above classes cannot be certified because they do not meet the requirements of Federal Rule of Civil Procedure 23.  Specifically, Defendants contend that Plaintiffs have failed to satisfy the Rule's commonality, adequacy, predominance,

---

*Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989) (joined by Breyer, J.) ("[U]nder [Rule] 8, it is not necessary that a legal theory be pleaded in the complaint if plaintiff sets forth "sufficient factual allegations to state a claim showing that he is entitled to relief under *some* viable legal theory.").

[3] Plaintiffs' class-certification arguments are tailored to their breach-of-contract claims.  Nowhere in their briefing and at no time during oral argument did the Plaintiffs discuss class-certification implications stemming from their claims for declaratory judgment or their claims asserting a breach of the duty of good faith and fair dealing.  The Court addresses their arguments accordingly.

and superiority requirements. Defendants also move to exclude the expert testimony of several of Plaintiffs' retained experts. The Court will address each Motion in turn.

## II. *Daubert* Motions

Federal Rule of Evidence 702 sets the standard for the admissibility of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

As explained by the United States Supreme Court, district courts occupy a gatekeeping role and must determine whether an expert's proffered testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). However, the United States Court of Appeals for the Eighth Circuit has recently explained that "the main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony," and "[t]hat interest is not implicated at the class certification stage where the judge is the decision maker." *Cody v. City of St. Louis*, 103 F.4th 523, 535 (8th Cir. 2024). Indeed, "[t]he ultimate *admissibility* of an expert's opinion is therefore a red herring at the class-certification stage." *Id.*

Recognizing this principle, the parties agreed at oral argument that it would be more proper for the Court to take up any arguments regarding the admissibility of the parties' expert testimony closer to trial. Doc. [182] at 41–42. Accordingly, the Court finds it appropriate to deny Defendants' Motions to Exclude at this time, without prejudice. Any renewed motions should address whether and to what extent other district courts have seen fit to exclude these experts'

testimony and the persuasiveness of those courts' reasoning. *See, e.g.*, *Jones v. Progressive Universal. Ins. Co.*, 2:22-cv-00364, 2024 WL 1254352, at *11 (E.D. Wis. March 25, 2024) (excluding Kirk Felix's expert testimony only in part and denying all other motions); *Brown v. Progressive Mountain Ins. Co.*, 3:21-cv-175, 2023 WL 9193005, *4, *6 (N.D. Ga. Sept. 20, 2023) (denying defendants' motion to exclude Martin and denying in part defendants' motion to exclude Felix); *Drummond v. Progressive Specialty Ins. Co.*, 5:21-cv-04479, 2023 WL 5181596, *5–7 (E.D. Pa. Aug. 11, 2023) (denying defendants' motion to exclude Martin, Merritt, and Felix), *rev'd on other grounds by*, 142 F.4th 149 (3d Cir. 2025).

### III.  Class Certification

It is Plaintiffs' burden to demonstrate that their proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23. *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374 (8th Cir. 2018). These include the threshold requirements of numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). The class must also be "clearly defined and adequately ascertainable," *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016), and fit "within 'one of the three subsections of Rule 23(b),'" *Stuart*, 910 F.3d at 374 (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th Cir. 2017). Here, Plaintiff seeks certification pursuant to Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Although "[a] district court has broad discretion to determine whether certification is appropriate," *Stuart*, 910 F.3d at 375 (internal quotations omitted), it "must undertake a rigorous analysis to ensure that the requirements of Rule 23 are met," *Sandusky*, 821 F.3d at 998 (citation omitted). For the following reasons, and after

undertaking the required analysis, the Court agrees with Defendants that Plaintiffs' class-certification arguments fail at the intersection of commonality and predominance.

### A. Plaintiffs' theory of liability does not constitute a common injury capable of class-wide proof, given the applicable policy language.

The Rule 23(a)(2) commonality and the Rule 23(b)(3) predominance requirements are interrelated. As the Eighth Circuit has "recently explained, commonality is subsumed within predominance, which is even more demanding." *Meek v. Kan. City Life Ins. Co.*, 126 F.4th 577, 583 (8th Cir. 2025) (internal quotations and citation omitted). "To satisfy both, a plaintiff must not only establish the existence of a common injury 'capable of classwide resolution,' but one that 'is susceptible to generalized, class wide proof.'" *Id.* (first quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); then quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). A common injury can be resolved classwide when the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349. The key question is "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453. This analysis "necessarily requires an examination of the underlying elements necessary to establish liability for plaintiffs' claims." *Blades v. Monsanto*, 400 F.3d 562, 569 (8th Cir. 2005) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). "If the same evidence [of defendant's liability] will suffice for each member to make a prima facie showing, then [defendant's liability] becomes a common question." *Sandusky*, 821 F.3d at 998.

Here, in addition to the common facts that necessarily stem from the parties' uniform contracts and Defendants' regularly applied business practices, Plaintiffs put forth two common questions and argue that their answers "will equally apply to all Class members." Doc. [61] at 23.

These are (1) "whether the PSA deduction is baseless and invalid, considering the data ignored and discarded from the calculation and evidence about dealer pricing practices in the modern used car market;" and (2) "whether . . . the invalid PSA deduction may be excised from insureds' valuation reports to arrive at a proper ACV amount." *Id.* These questions, in turn, correspond to Plaintiffs' "central question," "whether application of the PSA means . . . [that] Progressive is not calculating 'market value' as contractually required." *Id.* Defendants respond that Plaintiffs' theory of liability is misguided, so these purportedly common questions will not "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. From their perspective, "[t]he relevant question here is whether [applying the PSAs] produced an unreasonable estimate of the ACV of *each* class member's car." Doc. [76] at 19. This is because "to recover" under their claims, Plaintiffs "must prove that [Defendants] paid them less than they were owed for their vehicle." *Id.* The Court concludes that Defendants have the better part of the argument.

Of course, what constitutes a breach of the parties' agreements necessarily depends on the terms of those agreements.[4] "When interpreting an insurance policy, [a court] gives the policy language its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance." *Doe Run Res. Corp. v. Am. Guar. & Liab. Ins.*, 531 S.W.3d 508, 511 (Mo. banc 2017). As summarized above, Plaintiffs' automobile insurance policies require Defendants to pay, as applicable here, "the [ACV] of the stolen or damaged property at the time of the loss reduced by the applicable deductible." Doc [61-3] at 29. Thus, Plaintiffs' policies are "standard property

---

[4] To prevail on a claim for breach of insurance contract, a plaintiff must show "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010).

insurance polic[ies]," which require "damages . . . to be measured by the difference between the reasonable values of the property immediately before and immediately after the casualty." *In re State Farm Fire and Cas. Co. (LaBrier)*, 872 F3d 567, 573 (8th Cir. 2017) (quoting *Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 210 (Mo. banc 1983)). Ultimately, "the immediately-before value of the property must be estimated." *Franklin v. Lexington Ins. Co.*, 652 S.W.3d 286, 296 (Mo. Ct. App. 2022) (citing *LaBrier*, 872 F.3d at 574)).

How must Defendants estimate ACV in this case? Plaintiffs' policies specify that "[ACV] is determined by the market value, age, and condition of the vehicle at the time the loss occurs." Doc [61-3] at 30.[5] The ordinary meaning of "market value," in turn, is "the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so." *Atkinson v. Corson*, 289 S.W.3d 269, 279 (Mo. Ct. App. 2009) (citing *Turner v. Shalberg*, 70 S.W.3d 653, 659 (Mo. Ct. App. 2002)); *accord Metro. S. R. Co. v. Walsh*, 94 S.W. 860, 868 (Mo. 1906) (approving same). Accordingly, the plain meaning of Plaintiffs' policies imposes a contractual duty on Defendants to pay—when presented with a claim for a covered loss—the pre-accident price that Plaintiffs' vehicles would have brought when "offered for sale by an owner willing but under no compulsion to sell" and bought by a buyer who "is not compelled to do so," *Atkinson v. Corson*, 289 S.W.3d at 279, considering the age and condition of Plaintiffs' vehicles at the time of the accident, less Plaintiffs' respective deductibles, Doc. [61-3] at 29–30.[6]

---

[5] This is perhaps unsurprising because, especially in Missouri, "actual cash value is synonymous with fair market value in cases involving automobiles." *Sullivan v. State Farm Mutual Auto. Ins. Co.*, 702 F. Supp. 3d 794, 799 (W.D. Mo. 2023) (citing *Pannell v. Mo. Ins. Guar. Ass'n*, 595 S.W.2d 339, 354 (Mo. Ct. App. 1980)).

[6] The Seventh Circuit recently discerned the same duty from identical contact language under Indiana law. *See Schroeder v. Progressive Paloverde Ins. Co.*, 146 F.4th 567, 576 (7th Cir. 2025) (reversing class certification).

- 10 -

That this is the relevant contractual obligation imposed by Plaintiffs' policies makes sense because, as has long been recognized in Missouri, "[t]he basic premise of traditional property insurance is the concept of indemnity." *LaBrier*, 872 F.3d at 573; *accord Stevens v. Norwich Union Fire Ins. Co.*, 96 S.W. 684, 690 (Mo. Ct. App. 1906) ("That the whole theory of insurance is based upon the idea of indemnity, only, is fundamental . . . ."). Indeed, "[a]utomobile collision insurance, like other property insurance, is merely a contract of indemnity, and the insurer's only obligation, so far as damage to the vehicle is concerned, [is] to indemnify the plaintiff for actual loss and damage sustained." *Myers v. Am. Indem. Co.*, 457 S.W.2d 468, 471 (Mo. Ct. App. 1970) (internal citation omitted).

In this proper context, Defendants' application of the PSA does not constitute a *categorical* breach of its contractual duty.[7] *See Kroeger v. Progressive Universal Ins. Co.*, 4:22-cv-00104, 2023 WL 9059523, at *6 (S.D. Iowa Nov. 20, 2023) ("[T]he use of the [PSA] does not *per se* mean every Progressive policyholder received less than market value for their total-loss vehicles."). As an initial matter, Plaintiffs have not put forth any Missouri authority indicating that the PSA is facially unlawful. *Compare Ambrosio v. Progressive Preferred Ins. Co.*, --- F.4th ----, No. 24-2708, 2025 WL 2628179, at *4 (9th Cir. Sept. 12, 2025) ("[T]here is nothing facially unlawful

---

[7] The Court does not believe that *Smith v. Southern Farm Bureau Casualty Ins. Co.* requires a different result. 18 F.4th 976 (8th Cir. 2021). There, the Eighth Circuit reviewed plaintiff's factual allegations and found, applying Arkansas law, that they stated a plausible claim for breach of contract because the insurer had a duty "to pay the actual cash value" of plaintiff's vehicle "based on consideration of [its] fair market value, age, and condition." *Id.* at 980. Because plaintiff alleged that his insurer based its valuation on a PSA that was "arbitrary," "contrary to industry practices," and "not reflective of the vehicle's fair market value," the court concluded that the insurer "did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty." *Id.* at 980–81; *but see id.* at 981 (Colloton, J., dissenting) (disagreeing with the majority's summary conclusion that plaintiff gave adequate notice of the above breach of contract theory in his complaint). True, the *Smith* court considered a similar PSA and similar arguments regarding the PSA's impropriety, but its conclusion necessarily came after interpreting different contract language under a different state's law. Accordingly, *Smith* does not bind this Court as it endeavors to interpret different contractual provisions between different parties under Missouri law. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 72 (1995) (Thomas, J., dissenting) (noting the "limited and narrow" effect of the majority's ruling where its "interpretation of the contract represents only the understanding of a single federal court . . . [such that the opinion] has applicability only to this specific contract and to no other").

about Progressive's use of the PSA here."), *with Stuart*, 910 F.3d at 376 (recognizing that Arkansas law "explicitly prohibited insurers" from applying a challenged deduction), *and Jama v. State Farm Mutual Auto. Ins. Co.*, 113 F.4th 924, 935 (9th Cir. 2024) (acknowledging that a Washington statute prohibited a challenged negotiation adjustment).  Instead, the PSA appears to be a reasonable attempt to estimate the ACV of a claimant's vehicle because market value hinges, not only on the price a willing seller places on a vehicle, but on the price a willing buyer will pay.  *Cf. Myers*, 457 S.W.2d at 471 ("An actual sale of property proves its value, but a single, unaccepted offer does not." (citing *Hounihan v. State Farm Mut. Ins. Co.*, 441 S.W.2d 58, 62 (Mo. Ct. App. 1969))).  Recall that the PSA is only applied to comparable vehicles that have not yet sold, so by applying it, Defendants seek only to estimate the effect that a willing buyer might have on a willing seller's for-sale price.  *See Kroeger*, 2023 WL 9059523, at *20 (recognizing the PSA's predictive function).

But even if a jury agreed with Plaintiffs that the PSA results in an inaccurate estimation of their vehicles' market value, either because the PSA operates based on outdated "dealer pricing practices," or because Defendants' vendors ignored relevant data when calculating the PSA, Doc. [61] at 23, the answers to Plaintiffs' purportedly common questions still do not "drive the resolution of the litigation," *Dukes*, 564 U.S. at 350.  That is because it "remain[s] possible that the comparable cars in a given valuation report for a putative class member's totaled car were more valuable than the totaled car in ways that Progressive's other adjustments did not capture, offsetting any negative effect from applying Projected Sold Adjustments," and thus, any underpayment.  *Schroeder*, 146 F.4th at 576.  Therefore, determining whether Defendants breached their uniform insurance policies by underpaying ACV for Plaintiffs' vehicles—and those of the putative class members—may "only be determined based on all the facts surrounding a

particular insured's [covered] loss," such that "there are *no* predominant common facts at issue."[8] *LaBrier*, 872 F.3d at 577; *see also Freeman v. Progressive Direct Ins. Co.*, 149 F.4th 461, 469 (4th Cir. 2025) (reversing class certification and noting that "a breach [of identical contract language] could only be determined by matching what Progressive actually offered and paid with the evidence of the actual cash value based on the unique characteristics of each vehicle and the market in which it was valued."). Class certification is inappropriate under these circumstances.

**B. Even if Plaintiffs have put forth common issues related to Defendants' breach, individualized questions regarding proof of injury preclude class certification.**

Other courts have credited Plaintiffs' argument that their insurance policies impose onto Defendants a methodological duty that is breached if not followed. *See, e.g.*, *Knight v. Progressive Nw. Ins. Co.*, 3:22-cv-0203-JM, 2024 WL 5046481, at *5 (E.D. Ark. Dec. 9, 2024) (concluding that the relevant policies "specif[y] the method for calculating ACV payments" via a "prescribed formula" when they state that ACV "is determined by the market value, age, and condition at the time the loss occurs" (quoting *Stuart*, 910 F.3d at 376)). *But see Schroeder*, 146 F.4th at 579 (finding that the policy's "definition [of ACV] does not consist of a formula"). The Northern District of Alabama's assessment is representative:

> Progressive was obliged not merely to determine a reasonable ACV, but to do so based on the market value of each total-loss vehicle. . . . So, if [Plaintiffs] are correct and Progressive discarded crucial market data in calculating ACV, then it would indeed have breached its contractual duty to base ACV calculations on market value for each class member.

*Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 136 (N.D. Ala. 2024). If the Court assumes—contrary to its finding above—that this methodological duty is supported by the terms of the parties' insurance contracts, Plaintiffs have put forth common evidence of a breach of that

---

[8] As discussed *infra*, determining whether excising the PSA yields a "proper ACV amount" for any one putative class member's vehicle likewise requires an independent analysis of unique, vehicle-specific and comparator-specific facts.

duty. *See, e.g.*, Doc. [61-8] (setting forth expert opinion testimony that, in the modern used-car market, a vehicle's list price constitutes its market price); Doc. [62-4] at 61 (acknowledging that, prior to 2021, transactions where list-price equaled a vehicle's sold price was excluded). This is significant because Defendants' breach of the policy thus becomes a common question. *See Sandusky*, 821 F.3d at 998 (explaining that a common question exists where "the same evidence" suffices for "each member to make a prima facie showing"). However, "that there is *a* common question does not end the inquiry." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016). Predominance "is not satisfied if individual questions overwhelm the questions common to the class." *Id.* (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013) (citation modified). The Court concludes that individual questions would nevertheless predominate here.

Notwithstanding the importance of establishing a defendant's breach in a contract action, under Missouri law, "a claimant must show not only that the other party breached the contract but also that [the] claimant was damaged as a consequence of that breach." *Timberland Forest Prods. v. Franks*, 419 S.W.3d 806, 810 (Mo. Ct. App. 2013) (citing *Strouse v. Starbuck*, 987 S.W.2d 827, 829 (Mo. Ct. App. 1999)). Therefore, in the context of this case, every putative class member would *still* need to show that he or she received less than the ACV of their totaled vehicle to prevail on his or her claims.[9] *See Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149, 155–56 (3d Cir. 2025); *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022) ("Because [insurer] only owed each putative class member the actual cash value of his or her car, if a putative class member was given that amount or more, then he or she cannot win on the merits."). Rather than a mere calculation of post-liability damages, *see In re Pork Antitrust Litig.*,

---

[9] Because applying the PSA was not facially unlawful, it is not the case that all putative class members "received less than they were owed in the exact amount" of the PSA. *Jama*, 113 F.4th at 933 (discussing an adjustment that violated a state statute); *see Drummond*, 142 F.4th at 160 (drawing the same distinction); *Ambrosio*, 2025 WL 2628179, at *3–4 (same).

665 F. Supp. 3d 967, 1007 (D. Minn. 2023) (noting that individualized damages calculations are "not by [themselves] sufficient to preclude certification when liability can be determined on a class-wide basis"), this is an issue that directly bears on Defendants' liability in this action, *see In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194–95 (3d Cir. 2020) ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001))).

And, critically, whether each putative class member was paid ACV is an issue that is inherently individualized because it "involve[s] looking into the actual pre-accident value of the car and then comparing that with what each person was offered, to see if the offer was less than the actual value."[10] *Lara*, 25 F.4th at 1139; *see Drummond*, 142 F.4th at 159 (reversing certification because "identifying whether each class member was actually paid less than true ACV is an individual question" that could not be proven with class-wide proof). Plaintiffs disagree because, in their view, the Mitchell Report for each putative class member—with the PSA removed—constitutes common evidence of each putative class member's ACV. Doc. [61] at 19–20. After all, Plaintiffs do not dispute the accuracy of the Mitchell Report's other, non-PSA-related

---

[10] That the putative class members' proof of injury raises a predominance issue prompts yet another: has each putative class member suffered an injury in fact for purposes of standing? Within the Eighth Circuit, "in order for a class to be certified, each member must have standing and show an injury in fact." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013). While the Eighth Circuit has recognized that a party to a breached contract has "a judicially cognizable interest for standing purposes," *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016); *Stuart*, 910 F.3d at 377 (citing *GameStop* and concluding that the inability to prove contract damages is a merits question, not a question of standing), it is not entirely clear to this Court that *GameStop*'s conclusion survives intervening Supreme Court precedent, *see Dinerstein v. Google, LLC*, 73 F.4th 502, 522 (7th Cir. 2023) (determining that recent Supreme Court precedent shows that "a breach of contract alone—without any actual harm—is purely an injury in law, not an injury in fact"); *see also Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 415–16 (6th Cir. 2021) (avoiding such "thorny questions"). *But see Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) (concluding "traditional and recent precedent . . . reflect that a breach of contract is a sufficient injury for standing purposes"); *Meek*, 126 F.4th at 584 (recently noting, without analysis, that "members of the class suffered a concrete harm when [defendant] breached their insurance contracts, a judicially cognizable interest for standing purposes" (internal quotations omitted)).

deductions and adjustments, which already account for "differences in mileage, options, and condition" of the loss vehicles as well as the comparator vehicles.  *Id.* at 19; Doc. [83] at 15.  Therefore, according to Plaintiffs, "Mitchell has already done [the] individual valuations" that would be required.  Doc. [83] at 15.

The Court is not convinced that the individualized, ACV-underpayment inquiries can be resolved so easily.  The Third Circuit squarely foreclosed as much on similar facts.  *Drummond*, 142 F.4th at 159 ("[P]laintiffs [must] prove this core issue of underpayment—on which . . . damages in their breach-of-contract claim turn—with class-wide proof.  Plaintiffs cannot meet that burden.").  Similarly, the Ninth Circuit has recently explained, "[i]f the appraisal from the Mitchell Report resulted in a fair 'market value' assessment, even while using the PSA, then the ACV would be accurate, and there would be no injury.  This would be fatal to a potential class member's claim."  *Ambrosio*, 2025 WL 2628179, at *4.  Determining whether or not this is so would require individualized inquiries, class member by class member.  *Id.* at *5 ("This is the exact type of aggregation-defeating, individual issue on which members of a proposed class will need to present evidence that varies from member to member that Rule 23(b)(3) intends to prevent." (citation omitted) (citation modified)).[11]

Further, Defendants have introduced their own evidence in an effort to show that putative class members in fact received the ACV that they were owed.  *See In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 619 (8th Cir. 2011) (explaining that "individual defenses" may be

---

[11] In addition, based on the evidence currently in the record, the PSA is not "a discrete portion of [a] formula that is easily segregated and quantified."  *Stuart*, 910 F.3d at 376.  Rather, the PSA plays its part at the beginning of a larger equation such that it impacts several other values and variables that, taken together, ultimately yield a final Mitchell Report.  *See* Doc. [80-4] at 4–5 (describing Mitchell's methodology); Doc. [80-12] ¶¶ 13–16 (describing the PSA's impact on comparable-vehicle adjustments).  As a result, a method that "line-item[s] out each [PSA]" from a Mitchell Report, Doc. [61-9] at 8, merely results in a *new estimate* of a loss-vehicle's ACV.  Ascertaining whether that new estimate is more than, less than, or equal to the loss-vehicle's ACV would remain an individualized inquiry.  *See Lara*, 25 F.4th at 1139 (describing an "involved inquiry for each person" where a factfinder would need to look into the "actual pre-accident value" of a vehicle and "[compare] that with what each person was offered").

relevant to a court's certification analysis and "the relevance of such defenses must be subjected to the same rigorous inquiry as plaintiffs' claims"). For example, another source for vehicle-market-price estimations, the National Automobile Dealers Association Guidebook ("NADA"), appraises Plaintiff Bartee's loss vehicle at $421.13 lower than her Mitchell Report. Doc. [80-5] ¶ 48; *cf. Storie v. Duckett Truck Ctr., Inc.*, 4:06-cv-1238-DDN, 2007 WL 4454297, at *4 (E.D. Mo. Dec. 14, 2007) (noting that "NADA book values are a reliable and helpful source for determining a car's value"). Similarly, NADA provides a value that is $151 lower for Plaintiff Bledsoe. *Id.* ¶ 53. Thus, so the argument goes, a reasonable factfinder could credit NADA's estimate and find that Defendants paid Plaintiffs *more* than the ACV of their respective vehicles, PSA included. "Allowing Progressive to mount this defense towards the remaining proposed class members would render class certification inappropriate." *Ambrosio*, 2025 WL 2628179, at *4.

Defendants contend that they are entitled to present this type of individualized evidence to show that individual putative class members were paid what they were owed pursuant to the terms of their respective policies. Doc. [76] at 23. The Court agrees, *see Henson v. Progressive Premier Ins. Co. of Ill.*, 5:22-cv-00182-M, 2024 WL 3051264, at *10 (E.D.N.C. June 10, 2024) (noting that "[d]ue process requires that there be an opportunity to present every available defense," (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972))), especially because the evidence goes directly to whether any single putative class member could prove the essential "damages" element of their claim, *Ambrosio*, 2025 WL 2628179, at *4 ("Progressive is entitled to 'invoke individualized issues and provide sufficient evidence that the individualized issues bar recovery on at least some claims.'" (quoting *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th Cir. 2023))). And Defendants have put forth sufficient evidence indicating that the individualized issue of whether putative class members were in fact underpaid ACV will affect a significant percentage of the class. *Compare*

Doc. [80-11] ¶ 41 (indicating that their NADA-related arguments above would plausibly apply to "over 30%" of the class, given a 144-claim sample), *and id.* at ¶¶ 17–22, 36–39, 40, 42–45 (raising numerous individualized, ACV-payment issues out of a 150-claim sample), *with* Doc. [61] at 23 (asserting a class of 33,856 members).[12]

In sum, the question of Defendants' liability to the putative class members remains "an inquiry specific to [each member]." *Lara*, 25 F.4th at 1139; *Drummond*, 142 F.4th at 156 (explaining that the district court "would need to evaluate plaintiff-by-plaintiff proof to ascertain which plaintiffs Progressive actually underpaid"). Under these circumstances, even assuming a common question exists as to Defendants' methodological breach of Plaintiffs' insurance policies, the Court concludes that individual issues related to Defendants' liability in this matter predominate over common ones, and class certification is therefore improper. *See Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) ("Where too many individual questions predominate over common ones, certification is inappropriate.").

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Lillian Bartee and Plaintiff Lisa Bledsoe's Motion to Certify Class, Doc. [60], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Progressive Advanced Insurance Company and Defendant Progressive Casualty Insurance Company's Motions to Exclude, Docs. [85], [86], and [87], are **DENIED** without prejudice.

---

[12] This case is therefore unlike *Stuart v. State Farm Fire and Casualty Co.* in another important respect because, there, "the district court found [that] there was *insufficient* evidence that [the proof-of-injury] issue would affect a significant portion of the class." 910 F.3d at 377 (emphasis added).

**IT IS FURTHER ORDERED** that the parties' respective Motions for Leave to File Supplemental Authority and Responses thereto, Docs. [171], [175], [178], [180], [181], [183], and [185], are **GRANTED**.

**IT IS FINALLY ORDERED** that, no later than October 21, 2025, the parties shall file an Amended Joint Scheduling Plan to aid the Court in setting a Case Management Order to govern the remainder of this action.

Dated this 30th day of September 2025.

                                            MATTHEW T. SCHELP
                                            UNITED STATES DISTRICT JUDGE